# OFFICE OF CONSUMER COUNSEL *v.* DEPARTMENT OF PUBLIC UTILITY CONTROL ET AL.
## (SC 15823)

Callahan, C. J., and Berdon, Katz, Palmer and McDonald, Js.

Argued April 24—officially released August 4, 1998

*Bruce C. Johnson*, with whom, on the brief, was *Guy R. Mazza*, for the appellant (plaintiff).

*Tatiana D. Sypko-Eirmann*, assistant attorney general, with whom were *Robert S. Golden, Jr.*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, for the appellee (named defendant).

*Robert P. Knickerbocker, Jr.*, with whom were *Cynthia Brodhead* and, on the brief, *Kenneth H. Eagle* and *Frederic L. Klein*, for the appellee (defendant Connecticut Light and Power Company).

*Opinion*

CALLAHAN, C. J. The sole issue raised in this administrative appeal is the proper interpretation of Public Acts 1995, No. 95-43, § 1 (c), now codified as General Statutes § 16-19b (c),[1] which authorizes the department

[1] General Statutes § 16-19b (c) provides: "If the department, after notice and hearing, determines that the adoption of an energy adjustment clause would protect the interests of ratepayers of an electric company, ensure economy and efficiency in energy production and purchase by the electric company and achieve the objectives set forth in subsection (a) of section 16-19 and in section 16-19e better than would the continued operation of a fuel adjustment clause and a generation utilization adjustment clause, the department shall approve an energy adjustment clause to be superimposed upon the existing rate schedule of the electric company. The department shall design any such energy adjustment clause to reflect cost-efficient energy resource procurement and to recover the costs of energy that are proper for rate-making purposes and for which the department has not authorized recovery through base rates. These costs, reflecting prudent and efficient management and operations, may include, but are not limited to, the costs of oil, gas, coal, nuclear fuel, wood or other fuels, and energy transactions with other utilities, nonutility generators or power pools, all or part of the cost of conservation and load management, and the gross earnings tax imposed by section 12-264 on the revenues from the energy

of public utility control to approve an energy adjustment clause for an electric company to be superimposed on the company's base rate schedule. The named defendant, the department of public utility control (department), approved an energy adjustment clause for the defendant Connecticut Light and Power Company (power company), in accordance with the provisions of § 16-19b (c).[2] The plaintiff, the office of consumer counsel, a full participant in the hearings that led to the approval of the power company's energy adjustment clause, appealed from the decision of the department to the Superior Court pursuant to General Statutes §§ 4-183 and 16-35.[3] The plaintiff asserted that the department failed to protect ratepayer interests to the extent

sources subject to the energy adjustment clause. The department shall design the energy adjustment clause to provide for recovery of energy costs prudently incurred by an electric company in accordance with section 16-19e. Notwithstanding the provisions of section 16-19, the department shall make any changes to an energy adjustment clause in accordance with the provisions of subsections (d) and (g) of this section. An energy adjustment clause approved pursuant to this section shall apply to all electric companies similarly affected by the costs which form the basis for the adjustment clause."

[2] The department and the power company may be referred to collectively as the defendants when distinction is not necessary for the sake of clarity. United Illuminating Company (United Illuminating) was also a party to the hearing before the department. The plaintiff has not challenged the energy adjustment clause approved on behalf of United Illuminating, which, therefore, is not a party to this appeal.

[3] General Statutes § 4-183 (a) provides in relevant part: "A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . ."

General Statutes § 16-35 (a) provides: "Any person, including but not limited to a company, town, city, borough or corporation aggrieved by any order, authorization or decision of the Department of Public Utility Control, except an order, authorization or decision of the department approving the taking of land, in any matter to which such person was or ought to have been made a party or intervenor, may appeal therefrom in accordance with the provisions of section 4-183. Such person so appealing shall give bond to the state, with sufficient surety, for the benefit of the adverse party, in such sum as the department fixes, to pay all costs in case such person fails to sustain such appeal. No municipality or political subdivision shall be

required by statute, and that approval of the power company's energy adjustment clause was arbitrary, capricious and unreasonable. The trial court concluded that the department's factual and legal conclusions were legally and logically supportable and affirmed the department's decision. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to ourselves pursuant to Practice Book § 4023, now § 65-1, and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The following facts are relevant to the determination of this appeal. The department is a state agency authorized pursuant to title 16 of the General Statutes to regulate and supervise the operation of public service companies. The power company is a public service electric company as defined in General Statutes § 16-1 (4) and (8). It is, therefore, subject to regulation by the department. The plaintiff is "the statutory advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies . . . ." General Statutes § 16-2a (a).[4]

determined not to be aggrieved solely because there are other persons who are similarly affected by the order, authorization or decision of the department."

[4] General Statutes § 16-2a (a) provides: "There shall continue to be an independent Office of Consumer Counsel, within the Department of Public Utility Control for administrative purposes only, to act as the advocate for consumer interests in all matters which may affect Connecticut consumers with respect to public service companies and persons, firms and corporations certified, or seeking to be certified, to provide intrastate telecommunications service pursuant to sections 16-247f to 16-247h, inclusive. The Office of Consumer Counsel is authorized to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the department of public utility control and shall participate in such proceedings to the extent it deems necessary. Said Office of Consumer Counsel may appeal from a decision, order or authorization in any such state regulatory proceeding notwithstanding its failure to appear or participate in said proceeding."

Pursuant to its rate setting authority, the department, in a general rate proceeding, establishes the rate that an electric company must charge consumers. General Statutes §§ 16-19 (a) and 16-19e.[5] This rate is commonly

[5] General Statutes § 16-19 (a) provides: "No public service company may charge rates in excess of those previously approved by the authority or the Department of Public Utility Control except that any rate approved by the Public Utilities Commission or the authority shall be permitted until amended by the authority or the department, that rates not approved by the authority or the department may be charged pursuant to subsection (b) of this section, and that the hearing requirements with respect to adjustment clauses are as set forth in section 16-19b. Each public service company shall file any proposed amendment of its existing rates with the department in such form and in accordance with such reasonable regulations as the department may prescribe. Each electric, gas or telephone company filing a proposed amendment shall also file with the department an estimate of the effects of the amendment, for various levels of consumption, on the household budgets of high and moderate income customers and customers having household incomes not more than one hundred fifty per cent of the federal poverty level. Each electric company shall also file such an estimate for space heating customers. Each water company, except a water company that provides water to its customers less than six consecutive months in a calendar year, filing a proposed amendment, shall also file with the department a plan for promoting water conservation by customers in such form and in accordance with a memorandum of understanding entered into by the department pursuant to section 4-67e. Each public service company shall notify each customer who would be affected by the proposed amendment, by mail, at least one week prior to the public hearing thereon, that an amendment has been or will be requested. Such notice shall also indicate (1) the Department of Public Utility Control telephone number for obtaining information concerning the schedule for public hearings on the proposed amendment and (2) whether the proposed amendment would, in the company's best estimate, increase any rate or charge by twenty per cent or more, and, if so, describe in general terms any such rate or charge and the amount of the proposed increase, provided no such company shall be required to provide more than one form of the notice to each class of its customers. In the case of a proposed amendment to the rates of any public service company, the department shall hold a public hearing thereon, except as permitted with respect to interim rate amendments by subsection (d) and subsection (g) of this section, and shall make such investigation of such proposed amendment of rates as is necessary to determine whether such rates conform to the principles and guidelines set forth in section 16-19e, or are unreasonably discriminatory or more or less than just, reasonable and adequate, or that the service furnished by such company is inadequate to or in excess of public necessity and convenience. The department, if in

referred to as the "base rate." Because the base rate reflects a prospective anticipation of what rate will be

its opinion such action appears necessary or suitable in the public interest may, and, upon written petition or complaint of the state, under direction of the Governor, shall, make the aforesaid investigation of any such proposed amendment which does not involve an alteration in rates. If the department finds any proposed amendment of rates to not conform to the principles and guidelines set forth in section 16-19e, or to be unreasonably discriminatory or more or less than just, reasonable and adequate to enable such company to provide properly for the public convenience, necessity and welfare, or the service to be inadequate or excessive, it shall determine and prescribe, as appropriate, an adequate service to be furnished or just and reasonable maximum rates and charges to be made by such company. In the case of a proposed amendment filed by an electric, gas or telephone company, the department shall also adjust the estimate filed under this subsection of the effects of the amendment on the household budgets of the company's customers, in accordance with the rates and charges approved by the department. The department shall issue a final decision on each rate filing within one hundred fifty days from the proposed effective date thereof, provided it may, before the end of such period and upon notifying all parties and intervenors to the proceedings, extend the period by thirty days."

General Statutes § 16-19e (a) provides: "In the exercise of its powers under the provisions of this title, the Department of Public Utility Control shall examine and regulate the transfer of existing assets and franchises, the expansion of the plant and equipment of existing public service companies, the operations and internal workings of public service companies and the establishment of the level and structure of rates in accordance with the following principles: (1) That there is a clear public need for the service being proposed or provided; (2) that the public service company shall be fully competent to provide efficient and adequate service to the public in that such company is technically, financially and managerially expert and efficient; (3) that the department and all public service companies shall perform all of their respective public responsibilities with economy, efficiency and care for the public safety, and so as to promote economic development within the state with consideration for energy and water conservation, energy efficiency and the development and utilization of renewable sources of energy and for the prudent management of the natural environment; (4) that the level and structure of rates be sufficient, but no more than sufficient, to allow public service companies to cover their operating and capital costs, to attract needed capital and to maintain their financial integrity, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable; (5) that the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation and (6) that the rates, charges, conditions of service and categories of service of the companies not discriminate against customers which utilize renewable energy sources or cogeneration technology to meet a portion of their energy requirements."

necessary adequately to compensate an electric company, it is necessary for the department to make several reasoned assumptions regarding future events in setting the base rate. The assumptions relevant to this appeal are those regarding the anticipated fuel related costs that the company will incur in the future. Among other things, the department must make a reasonable assumption regarding an electric company's generation mix, that is, the anticipated ratio of nuclear power that will be available to the company from which to generate electricity to the amount of fossil fuel[6] that the company will require in order to generate an adequate supply of electricity. The power company has been given an anticipated nuclear generation capacity factor of 72 percent by the department in its most recent rate proceeding.[7] If that forecast proves to be incorrect, the power company must obtain either more or less fossil fuel than predicted to make up for the variation in the anticipated availability of nuclear power. The costs associated with obtaining fuel will vary depending on the amount, type and price of the fuel needed. The department must make certain reasonable assumptions pertaining to the cost of obtaining these fuels. If the assumptions with respect to the generation mix or the costs prove inaccurate, the base rate will not accurately reflect an electric company's actual costs.[8] If the company actually incurs lower costs than expected, receipt

_____

[6] Fossil fuels include oil, gas and coal. When the power company lacks sufficient nuclear power to generate the necessary amount of electricity, it must either obtain replacement nuclear power purchased from an alternate source or utilize fossil fuel generated electricity.

[7] The nuclear generation capacity factor is a figure that attempts to reflect the anticipated output of the facility. It takes account of those factors that would cause the facility to produce less than 100 percent of its purported capacity.

[8] For example, an unanticipated nuclear reactor shutdown will cause the generation mix to be inaccurate and the utility will be forced to purchase more fossil fuel than accounted for in the base rate. If there were an unexpected oil embargo, the price of fossil fuels would rise, and, consequently, the base rate would be inadequate to compensate the utility. Conversely,

of the base rate will overcompensate the company to the detriment of ratepayers. If the company's actual costs exceed those that are expected, collection of only the base rate will result in undercompensation to the company.

In response to this potential inequity, the legislature authorized the department to adopt certain formulae for each electric company that would permit interim rate adjustments for fuel related cost variations.[9] See General Statutes (Rev. to 1995) § 16-19b (a) and (g).[10] These formulae were to be integrated with the base rate formula when appropriate and a new rate, either higher or lower, would be determined to reflect the actual costs incurred by the company. A fossil fuel adjustment clause allowed adjustments when costs varied because of unanticipated changes in the price of fossil fuels. General Statutes (Rev. to 1995) § 16-19b (a). A generation utilization adjustment clause worked with the fossil fuel adjustment clause and allowed rate adjustments when costs varied as a result of an unanticipated change in the generation mix. General Statutes (Rev. to 1995) § 16-19b (g).

Although accurate reflection of an electric company's actual costs was the intended purpose of these formulae, it had become apparent in recent years that the

the increased efficiency of nuclear operations or the decline in fossil fuel prices could cause the base rate to reflect too high a rate of compensation for the utility.

[9] By "interim rate adjustments" we refer to the ability to increase or decrease the base rate according to a specified formula during the interval between regular rate proceedings in which the base rate is established.

[10] Although fuel adjustment clauses have been used throughout this century to adapt base rates to emergency situations, such as war or depression, the problem of inadequate compensation became prevalent in the 1970s when the cost of fossil fuel dramatically increased because of an oil embargo engaged in by the Organization of Petroleum Exporting Countries. It is these fuel adjustment clauses that precipitated the change to energy adjustment clauses by adoption of § 16-19b (c) in 1995, and we confine our discussion to these clauses.

fossil fuel adjustment clause and generation utilization adjustment clause were not effective in adjusting the base rate downward to reduce rates when the electric company was able to operate below its anticipated costs. Thus, electric companies, but not necessarily ratepayers, were benefiting by the operation of the fossil fuel adjustment clause and generation utilization adjustment clause. In 1995, the legislature enacted § 16-19b (c) authorizing the department to approve a new energy adjustment clause to replace the fossil fuel adjustment clause and generation utilization adjustment clause then existing for each electric company. Public Acts 1995, No. 95-43, § 1 (c). The purpose of the law was to create a single formula that would operate more consistently in protecting both ratepayers and electric companies by fully tracking all fuel related costs and permitting adjustments that accurately would reflect actual costs.[11] See 38 S. Proc., Pt. 5, 1995 Sess., pp. 1756–58, remarks of Senator Stephen R. Somma; 38 H.R. Proc., Pt. 4, 1995 Sess., p. 1252, remarks of Representative John W. Fonfara. Pursuant to § 16-19b (c), the department, after a hearing and a determination that the standards set forth in the statute would be met by an energy adjustment clause, approved an energy adjustment clause for the power company to replace its existing fossil fuel adjustment clause and generation utilization adjustment clause.[12]

---

[11] The term "fully tracking" is a term used by the parties to reflect the fact that the energy adjustment clause will address and account for all fuel related costs.

[12] The department held several hearings to evaluate the power company's proposed energy adjustment clause. A final decision was issued on October 8, 1996, in which the department concluded that it would not approve the proposed energy adjustment clause, but that it would approve a modified energy adjustment clause if it met certain directives contained in the decision. The power company was directed to reopen its most recent rate proceeding for the purpose of finalizing and implementing an energy adjustment clause. Thereafter, the department approved an energy adjustment clause for the power company on December 30, 1996. The plaintiff appealed from the October 8, 1996 decision. Although the power company asserts in

The plaintiff presents two arguments in support of its claim that the department's approval of the power company's energy adjustment clause was invalid. Both arguments relate to the proper interpretation of the first sentence of § 16-19b (c), in which the standard for approval of an energy adjustment clause by the department is set forth. Section 16-19b (c) provides in relevant part that "[i]f the department, after notice and hearing, determines that the adoption of an energy adjustment clause *would protect the interests of rate-payers* of an electric company, ensure economy and efficiency in energy production and purchase by the electric company and achieve the objectives set forth in subsection (a) of section 16-19 and in section 16-19e *better than would the continued operation of a fuel adjustment clause and a generation utilization adjustment clause,* the department shall approve an energy adjustment clause . . . ." (Emphasis added.) Both of the plaintiff's arguments rest exclusively on the proper statutory construction of the first clause of that sentence in which the ratepayer protection standard is set forth.

I

The plaintiff first asserts that the ratepayer protection standard set forth in § 16-19b (c) is an "intrinsic" standard that permits the department to approve only those energy adjustment clauses that protect the interests of ratepayers absolutely. The defendants argue, and the trial court agreed, that the standard is a "relative" one, requiring only that ratepayer interests need only receive greater protection under the energy adjustment clause

a footnote that, arguably, the plaintiff appealed from the wrong decision, the issues raised by the plaintiff in this appeal stem from the legal and factual conclusions reached by the department in its October 8, 1996 decision. The specific provisions of the actual energy adjustment clause are not relevant to the resolution of these issues.

than they received under the former fossil fuel adjustment clause and generation utilization adjustment clause.[13] According to the plaintiff's interpretation, § 16-19b (c) requires some undefined quantum of ratepayer protection that must be achieved in the abstract without any reference to the ratepayer protection available under the former fossil fuel adjustment clause and generation utilization adjustment clause.[14]

The plaintiff would interpret the energy adjustment clause approval standard set forth in § 16-19b (c) as if it read that the department shall grant approval of an energy adjustment clause for an electric company only if the energy adjustment clause would: (1) protect the interests of ratepayers absolutely; (2) ensure economy and efficiency absolutely; and (3) achieve the objectives set forth in §§ 16-19 (a) and 16-19e better than the continued operation of the electric company's then existing fossil fuel adjustment clause and generation utilization adjustment clause.[15] Under the plaintiff's interpretation, therefore, the § 16-19b (c) modifying phrase "better than would the continued operation of a [fossil] fuel adjustment clause and a generation utilization adjustment clause" would modify only the last clause of the

---

[13] The parties use the terms "relative" and "intrinsic" as a shorthand for describing their respective interpretations of the statutory standard. Although we acknowledge that these terms are imprecise and somewhat ambiguous, we adopt them for convenience, but do not necessarily endorse either as a proper appellation for the standard set forth in § 16-19b (c).

[14] The plaintiff apparently feels no need to define what would be required to achieve intrinsic ratepayer protection. It contends that if we conclude that the standard is intrinsic, and not relative as the department concluded, we must reverse the trial court's judgment and remand the case to that court with instructions to reverse the department's decision because it was reached "under a crucial legal misapprehension" and cannot be permitted to stand.

[15] The plaintiff does not assert that the department either improperly interpreted or violated the second or third provision. Because the plaintiff raises issues regarding only the first provision, we restrict our review to the proper interpretation and application of the ratepayer protection standard.

sentence relating to achieving the specified statutory objectives. According to the defendants and the trial court, that phrase must be read to modify all three of the standards set forth in the first sentence of § 16-19b (c), so that approval of an energy adjustment clause is required if the department finds, inter alia, that the energy adjustment clause would protect ratepayer interests better than would the fossil fuel adjustment clause and generation utilization adjustment clause. We agree with the defendants.

In resolving this dispute, we rely on well established rules of statutory construction. "Statutory construction is a question of law and therefore our review is plenary. . . . We . . . must effectuate the expressed [legislative] intent. . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature . . . . Ordinarily, if the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Citation omitted; internal quotation marks omitted.) *Charles* v. *Charles*, 243 Conn. 255, 258–59, 701 A.2d 650 (1997); *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

The plain language of § 16-19b (c) suggests that the phrase "better than [the existing fossil fuel adjustment clause and generation utilization adjustment clause]" was intended to modify each of the three preceding clauses. Had the legislature intended that it modify only the last clause, it would have indicated in some fashion

that the first and second clauses were independent of the third clause and the "better than" modifier. It could have accomplished this separation of the clauses by enumeration or by placing a semicolon after each of the first two clauses to indicate that they are clearly distinct from the third clause and its purportedly exclusive modifier. In any event, for the plaintiff's interpretation to be viable, it would be necessary for the final clause to be set off in some fashion to incorporate the modifier exclusively into that final clause.

Moreover, the legislative purpose and history confirm that the legislature intended the phrase "better than [the existing fossil fuel adjustment clause and generation utilization adjustment clause]" to modify the first clause relating to the protection of ratepayer interests. In explaining the bill, Somma stated: "This bill . . . essentially eliminates the fuel adjustment clause, as well as the [generation] utilization adjustment clause, and allows the Department to establish a broader adjustment clause to authorize an electric company to modify its rates to reflect changes in those rates, and costs in those rates. Before the new clause could be adopted . . . the Department must find that it actually *would better protect the ratepayers' interests.*" (Emphasis added.) 38 S. Proc., supra, p. 1756. When asked how the bill would ensure that an electric company would not receive an excessive rate of return, Somma responded that "the new energy adjustment clause . . . has to be found to be *in the interests, better interests* of the ratepayers before it's actually adopted. . . . [T]he [department] must find that it's first in the, in the ratepayers' interest and would *better protect* them before this new clause could be adopted. . . . [T]his would *better protect* the ratepayers' interests . . . ." (Emphasis added.) Id., pp. 1757–58. In the three brief pages of legislative history in the Senate, Somma refers to *better* protecting the interests of ratepayers no less than four

times. There can be little doubt in the face of this legislative history that the legislature intended the phrase "better than [the existing fossil fuel adjustment clause and generation utilization adjustment clause]" to modify the first clause relating to protecting ratepayer interests.

In addition, the legislative purpose in adopting § 16-19b (c) lends support to our conclusion that the legislature intended that ratepayer protection under the energy adjustment clause formula be better relative to the then existing fossil fuel adjustment clause and generation utilization adjustment clause formulae. The legislature's primary reason for adopting this legislation was dissatisfaction with the performance of the fossil fuel adjustment clause and generation utilization adjustment clause and the inability of those formulae to protect ratepayers by reducing the base rate when the electric company operated below its anticipated costs. See 38 S. Proc., supra, p. 1756. Because the fossil fuel adjustment clause and generation utilization adjustment clause were intended to protect ratepayer interests, it is reasonable to interpret § 16-19b (c) as requiring that the energy adjustment clause provide better protection than the fossil fuel adjustment clause and generation utilization adjustment clause.

We conclude that the department's approval of an energy adjustment clause is appropriate if the department finds that the energy adjustment clause will, inter alia, protect ratepayer interests better than would the existing fossil fuel adjustment clause and generation utilization adjustment clause. The department properly interpreted § 16-19b (c) as creating a "relative" rather than an "intrinsic" standard with respect to the protection of ratepayer interests. The trial court's affirmance of the department's interpretation of the ratepayer protection standard in that respect was, therefore, correct.

## II

By way of an alternative argument, the plaintiff contends that the department has exceeded the scope of its statutory authority pursuant to § 16-19b (c) by approving an energy adjustment clause that "imposed risks of generation plant management on [the power company's] ratepayers . . . ."[16] By the phrase "risks of generation plant management," the plaintiff refers to those variations in anticipated costs that occur as a result of management decisions, as opposed to variations that occur as a result of some independent action such as an act of God or market forces. Specifically at issue, according to the plaintiff, is the possibility that the energy adjustment clause might permit the power company to pass through to its ratepayers those management risks associated with the operation of its nuclear generation facilities.[17] The plaintiff rests its argument on its interpretation of the ratepayer protection standard in § 16-19b (c). In the plaintiff's view, the imposition of management risks is antithetical to the concept of ratepayer protection, even if that requirement is interpreted as relative rather than intrinsic.

---

[16] The plaintiff argues in its request for relief that we conclude that *"the risks of generation plant management* (nuclear or otherwise) *may not be imposed upon ratepayers in any [energy adjustment clause]* approved by the [department] under [§ 16-19b (c)]. This is because this statute requires that any [energy adjustment clause] protect ratepayer interests. No construction of this legal standard, this mandate to protect ratepayer interests— whether intrinsic or relative—which imposes on ratepayers the risk of generation plant management is reasonably supportable under the law." (Emphasis in original.)

[17] Although the plaintiff asserts that generation plant management relates to any type of generation plant, it has limited its discussion and analysis to the management of the power company's nuclear facilities. We, therefore, will limit our analysis accordingly. " 'Where an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived.' *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995)." *Commission on Human Rights & Opportunities* v. *Truelove & McLean, Inc.*, 238 Conn. 337, 344 n.11, 680 A.2d 1261 (1996).

The plaintiff's argument with respect to the impermissibility of shifting economic risk is essentially twofold. The first argument focuses on the department's factual determination. The plaintiff asserts that because the energy adjustment clause shifts more costs associated with management risks to ratepayers, the department could not conclude that the energy adjustment clause protects ratepayer interests better than do the fossil fuel adjustment clause and generation utilization adjustment clause. In its second argument, the plaintiff maintains that the ratepayer protection standard in § 16-19b (c) must be interpreted as an absolute prohibition on the imposition on ratepayers of any generation plant management risks associated with its nuclear operations. We are not persuaded by either argument.

A

The plaintiff asserts that the record demonstrates that the energy adjustment clause approved for the power company improperly passes along economic risks to ratepayers. Its means of reaching this conclusion is somewhat circuitous. First, it asserts that the energy adjustment clause *proposed* by the power company would impose more risk on ratepayers than would its former fossil fuel adjustment clause and generation utilization adjustment clause. It further asserts that the energy adjustment clause *actually approved* by the department is "substantially identical" to that which was proposed by the power company. It argues, therefore, that the energy adjustment clause actually approved passes along more economic risks than did the former fossil fuel adjustment clause and generation utilization adjustment clause and, thus, does not provide better ratepayer protection. By way of proof of its assertion that the proposed energy adjustment clause imposes more economic risks than the fossil fuel adjustment clause and generation utilization adjustment clause, the plaintiff points to a single piece of evidence

in the record. It notes that one expert testified that adopting the energy adjustment clause proposed by the power company would be beneficial for the power company because the power company would be perceived as a less risky enterprise in the financial community with the energy adjustment clause in place, with the result that it would be able to attract more capital at lower costs. In the plaintiff's view, this demonstrates that the energy adjustment clause proposed by the power company would provide less ratepayer protection than did the fossil fuel adjustment clause and generation utilization adjustment clause because if the power company is perceived as being in a better economic position, then clearly the ratepayers are in a worse position. Because the energy adjustment clause that was proposed by the power company is similar to the actual energy adjustment clause approved by the department, the plaintiff maintains that the actual energy adjustment clause must pass along more risks and provide less ratepayer protection than the power company's fossil fuel adjustment clause and generation utilization adjustment clause.[18]

While the proposed and actual energy adjustment clauses may be similar in a variety of respects, the department expressly refused to adopt the power company's proposal because it concluded that the proposal would not protect ratepayer interests sufficiently.[19] The department specifically concluded that the then existing fossil fuel adjustment clause and generation

---

[18] To demonstrate that the proposed and actual energy adjustment clauses are similar, the plaintiff notes that the department used the proposed energy adjustment clause as a starting point. Additionally, it indicates that the energy adjustment clause actually approved provides several technical features of the proposed energy adjustment clause and adopts incentives and nuclear performance aspects similar to those proposed.

[19] The department found, as a fact, that the proposed energy adjustment clause would not protect ratepayers, and that the energy adjustment clause it approved would protect ratepayer interests.

utilization adjustment clause also did not protect rate-payer interests sufficiently because "the [fossil fuel adjustment clause] does not adjust for differences in cost that result from changes in the mix of generation. The [generation utilization adjustment clause] was implemented to complement the [fossil fuel adjustment clause] by adjusting for changes in said costs. It no longer does so. . . . The [d]epartment concludes that the continued use of [the power company's fossil fuel adjustment clause] and [generation utilization adjustment clause] do not protect the interests of [the power company's] ratepayers . . . ." The department thereafter crafted its own energy adjustment clause for the power company, drawing on some aspects of the power company's proposals, and approved an energy adjustment clause that it found would protect ratepayers' interests better than the existing fossil fuel adjustment clause and generation utilization adjustment clause.[20]

We begin our analysis by noting that our review of an agency's factual determination is constrained by the Uniform Administrative Procedure Act (act). General Statutes §§ 4-166 through 4-189. Specifically, General Statutes § 4-183 (j) (5) mandates that a court "shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing

---

[20] The plaintiff also argues that it was inappropriate for the department to use the power company's proposal as a starting point because it is essentially the same as a proposal that was first adopted by the power company twenty years ago. According to the plaintiff, the power company's proposal cannot possibly meet the requirements of § 16-19b (c), adopted in 1995; Public Acts 1995, No. 95-43, § 1 (c); except by pure accident. We fail to see the efficacy of this argument. The mere fact of the age of the proposal does not prove that it could not, with necessary adjustments, meet the recently adopted statutory criteria. It may have done so by accident or by legislative design. The fact that the power company's proposal has been in existence for several years may mean no more than that the legislature has caught up with the industry's recommendation.

have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . . ." We have interpreted the standard of review set forth in the act as limiting our review such that "[w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 219 Conn. 51, 57, 591 A.2d 1231 (1991); see *DiBlasi* v. *Zoning Board of Appeals,* 224 Conn. 823, 829–30, 624 A.2d 372 (1993). An agency's factual determination must be sustained if it is reasonably supported by substantial evidence in the record taken as a whole. *Connecticut Resources Recovery Authority* v. *Planning & Zoning Commission,* 225 Conn. 731, 744, 626 A.2d 705 (1993); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 57. Substantial evidence exists if "the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred." (Internal quotation marks omitted.) *Connecticut Building Wrecking Co.* v. *Carothers,* 218 Conn. 580, 601, 590 A.2d 447 (1991); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* supra, 57. This "substantial evidence" standard is highly deferential and permits less judicial scrutiny than a "clearly erroneous" or "weight of the evidence" standard of review. *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control,* 216 Conn. 627, 640, 583 A.2d 906 (1990).

The plaintiff has failed to point to anything in the record from which we can conclude that the energy adjustment clause actually approved by the department does not protect ratepayer interests better than the former fossil fuel adjustment clause and generation utilization adjustment clause, let alone meet its heavy burden of demonstrating that the department's factual

conclusion lacks substantial support on the whole record. Even if we assume that the plaintiff is correct and the expert testimony regarding the benefit to the power company from its proposed energy adjustment clause would carry over and be applicable to the energy adjustment clause actually adopted, we cannot conclude from that single scrap of testimony that, on the whole, the energy adjustment clause would not protect ratepayer interests *better* than the existing fossil fuel adjustment clause and generation utilization adjustment clause. The plaintiff's zero-sums analysis of the relationship between ratepayers and the electric company, that is, that a gain for one side necessarily entails a loss for the other, is insupportable. The ability of an electric company to attract capital at lower rates inures directly to the benefit, not the detriment, of its ratepayers. The company's capital costs are passed through to the consumer pursuant to § 16-19e (a) (4), and if capital costs are lower, the rates charged to consumers will be lower. The department is directed by § 16-19b (c), in reference to § 16-19e (a) (4), to consider the electric company's need "to attract needed capital and to maintain [its] financial integrity . . . ." Although some risks may be passed through to ratepayers, the department reasonably could have concluded that the reduced capital costs sufficiently counterbalance that detriment to make the energy adjustment clause better for ratepayers than the fossil fuel adjustment clause and generation utilization adjustment clause. We conclude that the plaintiff has failed to meet its burden of proving that the record is devoid of substantial evidence to support the department's factual determination that the power company's approved energy adjustment clause will provide more ratepayer protection than its former fossil fuel adjustment clause and generation utilization adjustment clause.[21]

---

[21] The plaintiff also summarily asserts that the energy adjustment clause as approved would not protect ratepayers from the burden of short-term

## B

The thrust of the plaintiff's second argument is that it is never permissible for interim cost variations, namely, costs that vary from those that were anticipated in setting the base rate at the regular rate hearing, to be passed through to ratepayers if those cost variations are attributable to management risks. It maintains that this is true regardless of whether the costs were prudently or imprudently incurred and regardless of whether the variation will inure to the benefit of ratepayers as a rate decrease or to the company as a rate increase. The plaintiff does not deny that management risks may be passed through, but asserts that it may be done only in the regular rate proceeding through the establishment of the base rate. The sole basis for the plaintiff's argument is its interpretation of the ratepayer protection standard as prohibiting these interim cost adjustments because imposing management risks on ratepayers is antithetical to the concept of ratepayer protection.[22] We find no support for the plaintiff's con-

---

fuel cost fluctuations in their monthly electric bills. The plaintiff cites no support for this assertion, and our review of the record indicates that it is incorrect. Under the fossil fuel adjustment clause and generation utilization adjustment clause, the power company was permitted to make monthly rate adjustments to account for fuel related variable costs. Under the energy adjustment clause, adjustments are made every six months, and the department is obligated to review the operation of the energy adjustment clause every six months to ensure that it is functioning as intended. It would appear that this will give greater stability to ratepayers by keeping rates constant for at least six months rather than subjecting them to monthly fluctuations.

[22] The plaintiff seeks to support its argument that permitting nuclear fuel costs adjustments is improper by reference to the energy adjustment clause approved in favor of United Illuminating, which does not include such a provision. First, we note that we are presented only with claims relating to the defendant power company, not United Illuminating. The energy adjustment clause adopted for United Illuminating is of no significance to the analysis of whether the defendant power company's energy adjustment clause protects ratepayer interest better than its former clauses. Moreover, the absence of a nuclear cost recovery provision from one company's energy adjustment clause has no bearing on its presence in that of another. Not only has United Illuminating not sought such a provision, but the proportion

struction of § 16-19b (c) in its text, its legislative history or in the purpose underlying its adoption.[23]

First and foremost, it must be noted that the duty to protect ratepayer interests inures in every rate setting decision. As the plaintiff concedes, prudently incurred costs, even those attributable to management risks of nuclear facility operations, are necessary considerations in determining the base rate. See General Statutes § 16-19e. It is entirely unreasonable to conclude, therefore, that the imposition of management risks on ratepayers is contrary to the concept of ratepayer protection. Rather, it is a balancing of the interests of ratepayers and the needs of an electric company that establishes the appropriate standard for rate setting.

Moreover, the text of § 16-19b (c) belies the plaintiff's interpretation. Section 16-19b (c) provides, in relevant part, that "[t]he department shall design any such energy adjustment clause to reflect cost-efficient energy resource procurement and to recover the costs of energy that are proper for rate-making purposes and for which the department has not authorized recovery

---

of nuclear fuel in its generation mix is substantially less than that of the defendant power company. As found by the department, this fact provides ample incentive for United Illuminating not to seek such a provision.

[23] The defendants argue that the energy adjustment clause adopted for the power company would not impose generation management risks on ratepayers. The plaintiff does not claim, nor could we conclude, that any imprudently incurred costs are passed through to ratepayers. For the sake of analyzing the plaintiff's argument, we assume without deciding that interim rate adjustments under the energy adjustment clause approved on behalf of the power company might allow some prudently incurred fuel related costs attributable to management decision-making processes to be passed on to consumers.

We are somewhat confused, however, by the dissent's assertion, unsupported by either law or fact, that the energy adjustment clause does not protect ratepayer interests because it imposes the costs of the power company's mismanagement of its nuclear facilities on ratepayers. All parties, including the plaintiff, agree that costs attributable to *mismanagement* are not passed through by operation of the energy adjustment clause.

through base rates. *These costs, reflecting prudent and efficient management and operations,* may include, but are not limited to, the costs of oil, gas, coal, *nuclear fuel,* wood or other fuels, and energy transactions with other utilities . . . . *The department shall design the energy adjustment clause to provide for recovery of energy costs prudently incurred by an electric company in accordance with section 16-19e. . . .*" (Emphasis added.) Nowhere in § 16-19b (c) does the language prohibit the recovery of fuel related costs that are attributable to management risks. We will not adopt an "interpretation [that] imports ambiguity where none is apparent, [or that] engrafts language onto the statute that appears nowhere in the text." *Connecticut Assn. of Not-for-Profit Providers for the Aging* v. *Dept. of Social Services,* 244 Conn. 378, 395, 709 A.2d 1116 (1998).

Contrary to the plaintiff's assertion, § 16-19b (c) requires the department to design an energy adjustment clause that will enable the electric company to recover those costs not accounted for in the base rate, that is, interim cost variations, *"reflecting prudent and efficient management and operations"* including the costs related to nuclear fuel. (Emphasis added.) General Statutes § 16-19b (c). Additionally, the statute mandates the adoption of an energy adjustment clause that affords recovery of "energy costs prudently incurred . . . in accordance with section 16-19e." General Statutes § 16-19b (c). Section 16-19e establishes the general rate setting guidelines, which, as the plaintiff concedes, permit the department to set rates that will enable the company to recover in the base rate prudently incurred costs attributable to management decisions. Section 16-19e (a) (5) provides that "the level and structure of rates charged customers shall reflect prudent and efficient management of the franchise operation . . . ." The language of § 16-19b (c) permitting recovery of interim

costs in accordance with § 16-19e clearly demonstrates that the department is obligated to consider the same factors in adopting interim rates as are relevant in establishing the base rate. Consequently, we find no merit in the plaintiff's assertion that management risks may be passed through in the base rate but not by interim adjustments under the energy adjustment clause. To the extent that § 16-19e permits consideration of the risks of generation plant management in establishing the base rate, so too may it be considered in establishing interim rate adjustments in adopting an energy adjustment clause pursuant to § 16-19b (c).

This textual interpretation is supported by the legislative purpose and history of the statute. The primary impetus for this legislation was concern that electric companies were incurring lower costs than were reflected in their base rate and were overcharging ratepayers. See 38 S. Proc., supra, p. 1756, remarks of Senator Somma. The legislature intended that the ratepayers should be credited with a reduction in their rate if the electric company was incurring lower costs than anticipated. It is absurd, therefore, for the plaintiff to argue that the legislature intended that no cost variations attributable to management decisions could be passed through to ratepayers when there is a decrease in the company's costs that would inure to the benefit of ratepayers. If the company's management has increased its efficiency and thus reduced its costs below that which was anticipated in establishing the base rate, this is precisely the type of benefit that the legislature expected to be passed through to the ratepayers.

Furthermore, the legislature was concerned that the rates collected should *accurately* reflect the electric company's *actual costs*. Id. Its purpose was not solely to benefit ratepayers, but to provide an adjustment clause that would reflect all of the actual costs and ensure proper compensation that could not be obtained in the

absence of interim adjustments. The entire concept of interim rate adjustment clauses undermines the plaintiff's theory. The only purpose for permitting interim adjustments is to enable rates more accurately to reflect actual costs with less frequent regular rate hearings. The base rate, by its very nature as an anticipatory figure, is often an inaccurate reflection of actual costs. The only reason that adjustment clauses exist is to permit ratepayers to enjoy the benefit of lower actual costs and to protect the electric company from the burden of potential financial instability when the base rate would be inadequate compensation. If a prudently incurred fuel related cost attributable to a management risk stands to put the financial health of an electric company in jeopardy, the failure to permit an interim rate adjustment would undermine the whole purpose of adopting such clauses in the first instance.

Consequently, it would be equally absurd to conclude that the legislature intended the statute to decrease the base rate when a nuclear facility was efficiently operated but that the company was not entitled to the same protection of an increase in rates when its costs exceeded the anticipated costs, strictly as a result of prudent management decisions. "[C]ompelling principles of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Internal quotation marks omitted.) *Coley* v. *Camden Associates, Inc.*, 243 Conn. 311, 319–20, 702 A.2d 1180 (1997). The legislature left the determination of what costs were recoverable to the sound discretion of the department within the general standards set forth in § 16-19b (c). None of the limitations imposed include a prohibition on the recovery of a fuel related cost merely because it is

attributable to a management risk. In the absence of a showing that the department has abused its discretion or exceeded its statutory authority, we will not supplant the department's judgment with our own.[24]

The plaintiff's interpretations of the ratepayer protection standard in § 16-19b (c) are unpersuasive. It has failed to identify anything in the record that would indicate an abuse of discretion by the department or the absence of substantial evidence to support the department's factual conclusions. Furthermore, the plaintiff has not postulated a rational interpretation of § 16-19b (c) that would place the department's action beyond the scope of its statutory authority. Consequently, we conclude that the department correctly interpreted the statutory requirements of § 16-19b (c) in approving the energy adjustment clause for the power company.

The judgment is affirmed.

In this opinion KATZ and PALMER, Js., concurred.

MCDONALD, J., with whom BERDON, J., joins, dissenting. The question in this case is whether the department of public utility control (DPUC) honored its obligation to protect ratepayer interests. The DPUC was required by statute, while considering other factors, to adjust rates to protect the interests of the ratepayers, better than had been done under the previous rate-making provisions. Those former provisions had heavily favored the electric utilities over ratepayers for twenty years.

A reading of the DPUC order makes plain that the entire focus of the agency was upon the benefits to the

---

[24] We are mindful that our role as an appellate court is to interpret the law, not to make it. Even if we were inclinded to agree with the dissent's apparent belief that *no* costs associated with nuclear fuel should be passed through to ratepayers, whether to do so or not is a legislative policy decision that we are not empowered to override on the basis of our own feelings.

Connecticut Light and Power Company (CL&P). The only factor claimed to benefit the ratepayers is that of the resulting increased borrowing power of CL&P from the increased power bills paid by the ratepayers. This might, it is argued, create savings to be, perhaps, passed back to ratepayers as the ratepayers pay the costs of restoring CL&P's nuclear power facilities, all closed as a result of CL&P's highly efficient neglect. Simply put, the majority states what is good for CL&P is good for the ratepayers, even if the ratepayers pay for it. I cannot agree that this formula protects ratepayers.

If other evidence was needed to show that the DPUC failed in its duty, it is found in the DPUC's disparate treatment of CL&P and the United Illuminating Company (United Illuminating). In one order concerning rate adjustments due to energy costs, the DPUC approved such an adjustment of nuclear costs for CL&P but not for United Illuminating. The DPUC was frank to admit that CL&P requested such an adjustment and United Illuminating did not. Given CL&P's record of maintenance and operation of nuclear facilities, it should come as no surprise that CL&P would wish to pass along to its ratepayers the costs arising from the shutdown of every one of its nuclear facilities. United Illuminating, on the other hand, had nuclear energy suppliers without such a dismal record and opted not to seek such an adjustment.

I agree that strong public energy companies are needed in our state, but this requires more than ratepayers taking up the slack caused by mismanagement. In these circumstances, twenty years of monopoly with a favored base rate should have been ended by the DPUC as the legislature intended. It was not.

I respectfully dissent.