SOUTHERN NEW ENGLAND TELEPHONE COMPANY
*v.* DEPARTMENT OF PUBLIC UTILITY
CONTROL ET AL.
(SC 17168)

Borden, Norcott, Katz, Vertefeuille and Zarella, Js.

120

Argued November 30, 2004—officially released June 21, 2005

*Tatiana D. Eirmann,* assistant attorney general, and *William L. Vallee, Jr.,* for the appellants (defendants).

*Keith M. Krom,* with whom, on the brief, was *Timothy P. Jensen,* for the appellee (plaintiff).

*Opinion*

VERTEFEUILLE, J. The sole issue in this administrative appeal is the proper method for determining whether a public utility company earned unreasonable profits as a result of a work stoppage arising out of a labor dispute. More specifically, the question on appeal is the correct interpretation of the term "unreasonable profits" as used in General Statutes § 16-8b.[1] The named defendant,[2] the department of public utility control (department), appeals from the judgment of the trial court sustaining the appeal of the plaintiff, the Southern New England Telephone Company, from a ruling by the department. After investigating the financial ramifications of a strike at the plaintiff's facility pursuant to its obligation under § 16-8b, the department determined

[1] General Statutes § 16-8b provides: "Whenever a labor dispute at a public service company, as defined in section 16-1, results in a work stoppage for a period of more than seven days, the Department of Public Utility Control shall initiate a proceeding not later than thirty days after the termination of the labor dispute to determine whether the public service company, as a result of such work stoppage, earned unreasonable profits and whether the quality of service to the customers of such public service company was impaired. The department may issue such remedial orders as may be necessary to protect ratepayers including, but not limited to, refunds or other adjustments."

[2] The office of consumer counsel also appeared as a codefendant in this appeal pursuant to General Statutes § 16-2a (a), which authorizes the office of consumer counsel "to appear in and participate in any regulatory or judicial proceedings, federal or state, in which such interests of Connecticut consumers may be involved, or in which matters affecting utility services rendered or to be rendered in this state may be involved. The Office of Consumer Counsel shall be a party to each contested case before the Department of Public Utility Control and shall participate in such proceedings to the extent it deems necessary." For ease of reference, we refer only to the named defendant throughout this opinion.

that the plaintiff had earned $2.8 million in unreasonable profits during the strike and ordered the plaintiff to refund this amount to its customers. In sustaining the plaintiff's appeal, the trial court concluded that the department improperly had determined that the $2.8 million in profits earned by the plaintiff during the strike were unreasonable profits that warranted the entry of remedial orders under § 16-8b. The department now challenges this conclusion on the ground that the trial court improperly construed the term unreasonable profits as used in the statute. We agree with the department and, therefore, we reverse the judgment of the trial court.

The following facts and procedural history are relevant to our resolution of this appeal. The plaintiff is a public service company authorized to provide telecommunications service in this state pursuant to General Statutes § 16-1 (4) and (23). The department is a state agency that regulates the rates and operations of telecommunications companies pursuant to General Statutes § 16-1 et seq. In August, 1998, the Communications Workers of America, Local 1298 (union), conducted a twenty-six day strike against the plaintiff. The strike ended with the ratification of a new contract between the union and the plaintiff. Pursuant to its obligation under § 16-8b, the department initiated an administrative proceeding to investigate the impact of the strike on the plaintiff's profits and on the quality of service delivered to the plaintiff's customers during the strike period. After the completion of its investigation, the department concluded that the quality of service offered to the plaintiff's customers during the strike period was impaired and that the plaintiff had earned $2.8 million in unreasonable profits during the strike period. Pursuant to § 16-8b, the department issued remedial orders directing the plaintiff to refund $2.8 million to its customers. The plaintiff appealed from the department's

order to the trial court. The trial court upheld the department's findings that (1) the quality of service during the strike period was impaired and (2) the plaintiff had earned $2.8 million in profits during the strike period. The trial court concluded, however, that there was insufficient evidence in the record to support the department's determination that the $2.8 million in profits were unreasonable. The plaintiff had argued that the profits it had earned during the strike period were not unreasonable because the plaintiff's actual rate of return in the period before, during and after the work stoppage was below its statutorily authorized rate of return. The trial court agreed with the plaintiff that, because its rate of return during the strike period was below its authorized rate of return, its profits during the strike period were not unreasonable, and thus did not warrant remedial orders. Accordingly, the trial court sustained the plaintiff's appeal.[3] The department appealed from the trial court's judgment to the Appellate Court pursuant to General Statutes §§ 4-184 and 16-35 and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

The department claims in this appeal that the trial court improperly concluded that a public utility's authorized rate of return is the appropriate benchmark to be used in assessing whether the utility earned unreasonable profits during a work stoppage.[4] The department contends that whether a utility earned unreasonable profits such that remedial orders are war-

---

[3] Before rendering a final judgment, the trial court twice remanded the matter to the department with direction to elaborate on its decision and findings.

[4] The department also claims that the trial court improperly concluded that the analysis used by the department constitutes an invalid regulation under the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq. Because we conclude that the trial court improperly construed the term unreasonable profits, we do not reach this second issue.

ranted under § 16-8b should be determined using an incremental analysis. More specifically, the department claims that such an analysis involves comparing the change in the utility's profit levels before and during the work stoppage. The department further claims that the use of the rate of return methodology advocated by the plaintiff thwarts the purpose of § 16-8b.

The plaintiff responds that the trial court correctly concluded that the term unreasonable profits in § 16-8b refers to profits earned above the company's statutorily authorized rate of return. More specifically, the plaintiff claims that the legislative history of § 16-8b and the department's own precedent support the trial court's conclusion that the plaintiff's statutorily authorized rate of return is the correct benchmark by which to measure whether the plaintiff earned unreasonable profits. We agree with the department and, therefore, we reverse the judgment of the trial court sustaining the plaintiff's appeal.

Because we are mindful of the highly technical nature of public utility regulation, we begin with a brief overview of relevant principles and terminology before turning to the department's claims. Public utilities operate in noncompetitive or minimally competitive environments, making profit regulation necessary to assure that a utility does not have unbridled discretion in charging for its services. P. Garfield & W. Lovejoy, Public Utility Economics (1964) pp. 1–2. As part of this state's profit regulation measures, the department sets a maximum authorized rate of return for each utility. See Application of the Southern New England Telephone Company for Financial Review and Proposed Framework for Alternative Regulation, Dept. of Public Utility Control, Docket No. 95-03-01 (March 13, 1996), p. 9. "An authorized rate of return is not a guarantee of any level of revenues or return." (Internal quotation marks omitted.) *Connecticut Light & Power Co.* v. *Public Util-*

*ities Control Authority*, 176 Conn. 191, 208, 405 A.2d 638 (1978). This court has recognized that differences may exist between a company's authorized rate of return and its actual rate of return. See id. "A regulatory commission is powerless to 'guarantee' a specified rate of return. All it can do is determine the rate of return that *may* be earned by the utility. . . . [T]he authorized rate of return is in the nature of an 'opportunity' rather than a 'guarantee.' " (Emphasis added.) P. Garfield & W. Lovejoy, supra, p. 45. A utility company's profits are regulated pursuant to General Statutes § 16-247k. Section 16-247k (c) mandates that a utility may not realize profits in excess of a ceiling set by the depart-ment.[5] This ceiling is referred to as the utility's author-ized "rate of return." Under § 16-247k (c), a utility company may utilize only profits earned within this authorized rate of return, which was 9.92 percent for the plaintiff during 1998, the year in which the strike occurred. We emphasize that this figure is a ceiling that utilities typically do not actually realize. In other words, although utilities are permitted to achieve a profit mar-gin up to the statutorily authorized rate of return, they typically operate at a level of profitability below this figure.

The question in the present case is the meaning of the term "unreasonable profits" as used in § 16-8b with reference to the period of a work stoppage. Central to this determination is the correct methodology for determining the reasonableness of the profits earned,

[5] General Statutes § 16-247k (c) provides: "During the monitoring period of an approved plan for an alternative form of regulation, the telephone company shall use any earnings in excess of a ceiling approved by the department to offset the depreciation reserve deficiency of the company." Section 16-247k, the provision currently governing the plaintiff's profit levels, was not in place when § 16-8b was enacted in 1987. At the time that § 16-8b was enacted, however, the plaintiff's profit levels were monitored under General Statutes § 16-19, which also regulated the plaintiff's profits using a rate of return framework.

because the plaintiff and the department advocate different methodologies for making this determination. The plaintiff advocates using a rate of return methodology, whereby unreasonable profits would be determined by calculating whether the profits it earned during the work stoppage exceeded its maximum authorized rate of return as set by the department under § 16-247k (c). The department contends that, because a utility's maximum authorized rate of return does not contemplate the specific statutory limitation on profits earned during a work stoppage, this figure cannot be used to calculate whether the plaintiff earned unreasonable profits during the strike. Accordingly, the department advocates the use of an incremental methodology, which determines the portion of a utility's profits that the utility would not have earned but for the work stoppage. Specifically, using the incremental methodology, the department determines a utility's profit level before the work stoppage and compares it with the utility's profit level during the work stoppage. If the utility's profit level during the work stoppage exceeded its profit level prior to the work stoppage, the difference between the two figures determines the amount of unreasonable profits that the utility earned during the work stoppage. Therefore, the primary distinction between the two methodologies proposed by the parties is whether to use the utility's maximum authorized rate of return or its actual profit level before the work stoppage as the gauge for calculating unreasonable profits. With these principles in mind, we turn to the department's claim.

As a preliminary matter, we set forth the applicable standard of review. Resolution of the department's claim requires us to construe the relevant statutory provision, § 16-8b. Because the proper meaning of the term "unreasonable profits" as used in § 16-8b poses a question of statutory interpretation, our review is

plenary. See, e.g., *Perodeau* v. *Hartford*, 259 Conn. 729, 735, 792 A.2d 752 (2002). "[While] [o]rdinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes . . . when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference. . . . [I]t is for the courts, and not administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) *Sweetman* v. *State Elections Enforcement Commission*, 249 Conn. 296, 305–306, 732 A.2d 144 (1999). Thus, because this court previously has not interpreted § 16-8b, we will conduct our own analysis of the statute's meaning.[6]

Relevant legislation and precedent guide the process of statutory interpretation. General Statutes § 1-2z provides that, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." In the present case, the parties concede that unreasonable profits had not been defined in § 16-8b or related statutes, and that therefore its meaning is not plain and unambiguous. We agree with the parties, and we are therefore not limited to the text of § 16-8b in determining its meaning. When the meaning of a statute is not plain and unambiguous, "we [also] look to the words of the statute itself, to the legislative his-

---

[6] While this standard of review is not typical of administrative appeals, we note that we previously have employed this nondeferential standard of review in administrative appeals raising original questions of statutory construction. See, e.g., *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 116–17, 830 A.2d 1121 (2003).

tory and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter [for interpretative guidance]." (Internal quotation marks omitted.) *State* v. *Lutters*, 270 Conn. 198, 205–206, 853 A.2d 434 (2004). "[O]ur fundamental objective [in statutory interpretation] is to ascertain and give effect to the apparent intent of the legislature . . . ." (Internal quotation marks omitted.) *Office of Consumer Counsel* v. *Dept. of Public Utility Control*, 246 Conn. 18, 29, 716 A.2d 78 (1998). With these principles in mind, we turn to the merits of the department's claim.

We begin our analysis, as we always do, with the text of the statute, which provides: "Whenever a labor dispute at a public service company, as defined in section 16-1, results in a work stoppage for a period of more than seven days, the [department] shall initiate a proceeding not later than thirty days after the termination of the labor dispute to determine whether the public service company, as a result of such work stoppage, *earned unreasonable profits* and whether the quality of service to the customers of such public service company was impaired. The department may issue such remedial orders as may be necessary to protect ratepayers including, but not limited to, refunds or other adjustments." (Emphasis added.) General Statutes § 16-8b. This court therefore must determine the legislature's intent in using the term "unreasonable profits."

We note that the term "unreasonable profits" does not appear elsewhere in the statutes relating to utility regulation, suggesting that, in enacting § 16-8b, the legislature intended to establish an approach to measuring profits during a strike that is different from that contained elsewhere in our utility regulation statutes. "[T]he proper construction of any statute must take into account the mandates of related statutes governing

the same general subject matter." (Internal quotation marks omitted.) *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 681, 849 A.2d 813 (2004). This court presumes that the legislature does not choose statutory language without reason. See *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 613, 440 A.2d 810 (1981) (legislature was presumed to have used exact words "actual damages" to express specific intent).

Relevant to the discussion in the present case is § 16-247k, which governs the plaintiff's maximum allowed profits in its ordinary course of operation. Under § 16-247k (c), a utility may not earn profits "in excess of a ceiling approved by the department . . . ." As previously stated, this "ceiling" refers to a utility's authorized rate of return. In the present case, the plaintiff claims that since it did not earn profits in excess of the ceiling under § 16-247k (c) during the work stoppage, it did not earn unreasonable profits under § 16-8b. The analysis urged by the plaintiff therefore equates a utility's unreasonable profits under § 16-8b with its excess earnings under § 16-247k (c), which implies that § 16-8b serves the same monitoring function as § 16-247k. We simply cannot impute this intent to the legislature. If the legislature intended a utility's authorized rate of return to be the benchmark for measuring unreasonable profits during a strike, as the plaintiff contends, the legislature easily could have used language such as "profits in excess of the company's authorized rate of return" or analogous provisions when it drafted § 16-8b. The legislature did not do so, however, choosing to employ instead a different term, "unreasonable profits." We presume that the legislature is aware of existing statutes when enacting new ones. See, e.g., *New Haven* v. *Bonner*, 272 Conn. 489, 496, 863 A.2d 680 (2005). "[I]t is a basic tenet of statutory construction that the legislature [does] not intend to enact meaningless provisions. . . . [I]n construing statutes, we presume that

there is a purpose behind every sentence, clause, or phrase used in an act and that no part of a statute is superfluous." (Internal quotation marks omitted.) *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 410, 780 A.2d 903 (2001).

The legislative history for § 16-8b confirms the textual suggestion that the legislature did not intend "unreasonable profits" as used in the statute to be measured by a utility company's authorized rate of return. The statute's legislative history suggests that, in determining whether a public utility has earned unreasonable profits under § 16-8b, the correct inquiry is whether the utility benefited from the strike by earning profits that would not have been earned otherwise. During the debate on the bill underlying § 16-8b, legislators repeatedly expressed a concern that a utility not reap windfall profits, as a result of not paying labor costs, at a time when service to customers was impaired.

Section 16-8b was enacted in response to concerns from consumers following a strike at the plaintiff's facilities in 1986. During floor debate in the House of Representatives, Representative Joseph A. Adamo stated that the underlying bill was proposed in response to consumer "petitions with 5000 or 6000 signature[s] on them indicating that their service was terrible during the strike." 30 H.R. Proc., Pt. 7, 1987 Sess., p. 2418. He explained that the bill provided that after a strike was over, the department would be required to "look at the company's operations during that period and make a determination (1) if for example the non-payment of wages for an eight or ten or twelve week period resulted in unreasonable profits. And if so, was the service up to par during that period as well. And if they were to make a determination that the service was below standard, that the profits were *above standard*, they would make a determination just as they can now, for example, if for whatever reason they find that a profit

margin is much too high . . . ." (Emphasis added.) Id., pp. 2407–2408. Representative Doreen M. DelBianco further stated that the bill's purpose was to determine "whether there was any advantage to the company to not have the labor costs during [a work stoppage]" and to ensure that "there was no taking advantage of by any company of [a work stoppage]." Id., p. 2412. During Senate debate on the passage of the underlying bill, Senator Gary A. Hale stated that "[the bill was] designed to protect the rate-payer. And to [e]nsure that during the period of a work stoppage, that the quality of service to [a] . . . customer, if it is diminished, [then] the customer should be protected." 30 S. Proc., Pt. 4, 1987 Sess., p. 1170. Senator Hale explained that "during a labor dispute, public utility customers often are not getting full service. But they are required to pay the full price, nonetheless. And I think it's an unfair burden . . . on the consumer who actually has no alternative service . . . . And it's an unfair advantage to the utility that could *reap windfall profits*. And the motive behind the bill is simply to allow the [department] to examine the utility company's earnings during that period and to [e]nsure that the utility customer's position is not compromised." (Emphasis added.) Id., p. 1172.

These remarks evidence the legislature's concern that a utility company not profit unfairly, "above standard" as Representative Adamo stated; 30 H.R. Proc., supra, p. 2408; or realize "windfall profits" as a result of the strike, as expressed by Senator Hale. 30 S. Proc., supra, p. 1172. This intent supports the use of an incremental analysis of profits earned during the strike, rather than using the plaintiff's authorized rate of return because most utility companies operate at a profit rate that is *less* than the ceiling established by its authorized rate of return. If the authorized rate of return were used as the gauge to measure whether profits were unreasonable, a utility company would be permitted to *increase*

its profit as a result of the strike as long as this increase did not exceed the ceiling set by the utility's maximum authorized rate of return. Such a result, however, would be contrary to the clear intent of the legislature in that it would permit an increase in the utility's profit to the disadvantage of the consumer, who is likely experiencing impaired service as a result of the strike. The authorized rate of return method advocated by the plaintiff is therefore inconsistent with the legislature's intent.

By contrast, the incremental analysis employed by the department is consistent with the legislature's intention in that it utilizes the amount of profit that the company was realizing just before the strike as the benchmark by which to measure the company's profits during the strike. This methodology will detect all increases in profit resulting from the strike by comparing profits during the strike with the company's operating profit margin just prior to the strike. As Representative DelBianco stated, "labor costs, benefits, wages, are all part of the rate making process, and those benefits and wages are figured into the rate the utility companies charge. . . . [I]f a work stoppage results in . . . that formula being changed because you didn't pay those labor costs, then we need to see *if you've gained at all from that*, and if you did, then maybe we need to give the money back to the customers." (Emphasis added.) 30 H.R. Proc., supra, p. 2424.

The plaintiff argues that several legislators mentioned rate of return in the floor debate on the bill, thus indicating that the authorized rate of return should be the benchmark for determining unreasonable profits during a work stoppage. We construe these remarks differently.

Both Senator Steven Spellman and Representative DelBianco questioned the legitimacy of using a utility's rate of return in calculating unreasonable profits during

a work stoppage. Senator Spellman emphasized that a utility's rate of return is established in view of the levels of service it is providing to its customers, stating that "[w]hen rates are set by the [department], they take into consideration a reasonable rate of return based upon an expected service." 30 S. Proc., supra, p. 1170. In addressing the impact of a work stoppage on this predetermined rate of return, Senator Spellman noted that the underlying bill would allow the department to "take into consideration, when setting rates, work stoppages and excessive profits that may have been earned during a time period because an expected service which was addressed at the previous rate hearing was not, in fact, delivered to the consumers." Id., pp. 1170–71. Senator Spellman's testimony therefore implies that the legitimacy of a utility's rate of return must be reconsidered if it fails to deliver the service originally contemplated when setting that rate. Representative DelBianco further explained the link between a utility's rate of return, labor costs and service quality: "[The] rate of return [is] based upon a service that was to be provided prior to the work stoppage. If, during a work stoppage that service is changed, then perhaps that rate that was charged is no longer legitimate because things like labor costs that were figured into how you pay that rate change and [may] be less, and so that . . . might affect the rate that was charged to the customer." 30 H.R. Proc., supra, pp. 2414–15. We understand these remarks as rejecting the use of the authorized rate of return as an appropriate gauge for calculating unreasonable profits at a time when service is subpar and labor costs are reduced.

On the basis of the text of § 16-8b and its legislative history, we conclude that the trial court improperly determined that the authorized rate of return was the appropriate gauge by which to measure the plaintiff's profits during the 1998 work stoppage. We further deter-

mine that the department correctly employed an incremental analysis in determining that the plaintiff earned $2.8 million in unreasonable profits during the work stoppage.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiff's appeal.

In this opinion the other justices concurred.