[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISIONRE: RULING ON REQUEST FOR TEMPORARY INJUNCTION
The plaintiffs Teshana Byars and her parents, Dennis Byars and Arline Stephenson, Levaughn Johnson and his mother, Theresa Williams, Bryan Layton and his mother, Cynthia Slaney, and Aimee Scarduzio and her parents, Joseph and Sherry Scarduzio, bring this action against the defendants, City of Waterbury ("Waterbury"), Waterbury Board of Education ("Board") and Roger Damerow ("Damerow"), superintendent of Schools, challenging the validity of the uniform policy and the dress code sections of the school attire policy of the Waterbury Board of Education. The plaintiffs bring this action pursuant to 42 U.S.C. § 1983
and allege that the school attire policy (1) violates their constitutional rights as guaranteed by the fourth, ninth andfourteenth amendments to the United States' constitution, (2) violates each adult plaintiff's right to parental autonomy in violation of the first and fourteenth amendments to the United States' constitution; (3) violates each plaintiff's right to a free public education in violation of article eight section 10 of CT Page 7512 the Connecticut constitution; and (4) violates the plaintiffs' right to personal liberties and privacy in violation of article first, sections 7, 8, 9 and 10 of the Connecticut constitution. (Complaint, pp. 13-14.) Wherefore, the plaintiffs are currently seeking a temporary injunction enjoining the defendants from enforcing the school attire policy against the plaintiffs. For the reasons that follow, the request for a temporary injunction is denied.[1]
 I. BACKGROUND
A. The Parties and Proceedings
The plaintiffs are minor children who attend Waterbury middle schools and their parents. They challenge the constitutionality of the school attire policy adopted by the Board for the 1998-1999 school year. All minor plaintiffs have been suspended from school for violations of the school attire policy since the adoption of new disciplinary procedures for such violations on February 17, 1999 by the Board.
The minor plaintiff, Teshana Byars, is a twelve year old seventh grade student at North End Middle School in Waterbury, Connecticut. Teshana's parents opted-out of the uniform policy at the beginning of the school year. Since March 11, 1999, she has been suspended from school for three days for wearing blue jeans in violation of the school attire policy. She has also been suspended five days since March 11, 1999, for refusal to obey a direction by a staff member in relation to her wearing blue jeans to school and attending school on days she was suspended. In addition, Teshana was arrested and charged with criminal trespass for attending class when she was suspended on March 24, 1999.
The minor plaintiff, Levaughn Johnson, is a twelve year old sixth grade student at the West Side Middle School in Waterbury, Connecticut. His mother attempted to opt-out of the uniform policy but did not submit the form within the required time. Levaughn has been suspended from school ten times since March 29, 1999 for violation of the uniform policy for wearing blue jeans and colored shirts not in compliance with the uniform policy.
The minor plaintiff, Bryan Layton, is a thirteen year old seventh grade student at West Side Middle School in Waterbury, Connecticut. Bryan is subject to the uniform policy. Bryan has CT Page 7513 been suspended from school five times since March 26, 1999 for violation of the dress code for wearing black pants or jeans and sweatshirts not in compliance with the uniform policy.
The minor plaintiff, Aimee Scarduzio, is a thirteen year old eighth grade student at the Wallace Middle School in Waterbury, Connecticut. Aimee's parent opted-out of the uniform policy at the beginning of the school year. Aimee has been suspended four times for wearing blue jeans to school in violation of the school attire policy since April 5, 1999.
The parents of these minor plaintiffs join in this suit for alleged violations of their constitutional right to parental autonomy and to free public education.
B. Legislative Authority
"The constitution of Connecticut, article eighth, § 1, provides that [t]here shall always be free public elementary and secondary schools in the state. The general assembly shall implement this principle by appropriate legislation.' This mandate of the state constitution places the ultimate responsibility for the education of the children of Connecticut on the state. Connecticut General Statutes § 10-220 delegates the state's responsibility to provide and administer public education to local and regional boards of education . . . Packer v. Boardof Education, 246 Conn. 89, 103-04, 717 A.2d 117 (1998). Section10-220 provides in relevant part: "Each local or regional board of education shall maintain good public elementary and secondary schools, implement the educational interests of the state . . . and provide such other educational activities as in its judgment will best serve the interests of the school district; . . . and shall give all the children of the school district as nearly equal advantages as may be practicable; shall provide an appropriate learning environment for its students which includes . . . (3) a safe school setting. . . ." Section 10-221
provides: "Boards of education shall prescribe rules for the management, studies, classification and discipline of the public schools. . . ."
In 1996, the Connecticut General Assembly enacted Public Act 96-101, subsequently codified as General Statutes § 10-221f. Section 10-221f provides:
A local or regional board of education may specify a CT Page 7514 school uniform for students in schools under its jurisdiction.
This legislation was originally introduced on February 22, 1996 as House Bill 5417, which provided as follows:
 Section 1. (New) A local or regional board of education may specify a school uniform for students in schools under its jurisdiction to wear on a voluntary basis.
The bill was referred to the Joint Standing Committee on Education from which a request was made to the Office of Legislative Research ("OLR") to provide a memorandum addressing "state laws that allow school boards to require students to wear uniforms and the results of court challenges in Long Beach, California and Phoenix, Arizona regarding uniform requirements in those districts." Connecticut General Assembly Office of Legislative Research, Report on "School Uniforms" dated February 28, 1996. The OLR memorandum reported that five states (California, Delaware, North Carolina, Virginia and Utah) have authorized its school districts to require students to wear uniforms in school and that uniform policies in Long Beach, California and Phoenix, Arizona had survived court challenges.
Substitute House Bill 5417 was then submitted for consideration. The substitute bill deleted the phrase "on a voluntary basis." The Education Committee approved the substitute bill without further discussion. On April 16, 1996, the substitute bill passed the House of Representatives without debate. The bill was presented to the Senate and was unanimously approved on April 25, 1996 without debate.
C. The Waterbury School Attire Policy
The Discipline Policy and Education Records Policy ("Discipline Policy") of the Board now in effect was adopted on December 16, 1991 and revised to its current form for the 1998-1999 school year. Article 5 of the discipline policy specifies the school attire policy for all elementary, middle and high schools. The attire policy's stated purpose for the 1998-1999 school year states that "[o]ne of the primary functions of school is to provide the foundation for the formation and development of proper attitudes. One basic attitude is seriousness of purpose toward education. The conduct and dress CT Page 7515 which is acceptable and proper for play, recreation and home may not be acceptable for the school environment. Each parent/guardian is responsible for his/her child's dress. The cleanliness, health and safety of the child must be the concern of every parent/guardian." Discipline Policy, Article 5.
Pursuant to § 10-221f, in the 1997-1998 school year, the Board conducted a pilot program which required the students to wear uniforms in twelve elementary schools, one middle school and one high school. Based upon its evaluation of the pilot program, the Board expanded the uniform policy to all elementary and middle schools for the 1998-1999 school year.
The school attire policy for the 1998-1999 school year consists of three main components. The first component is a mandatory dress code that prohibits specific items of clothing, jewelry, footwear and electronic devices. The second component is a uniform policy from which students may be exempted if their parents so choose. The third component is a dress code specifically for the high schools.[2]
The mandatory dress code applies to all students from Pre-K through 12. It prohibits the following:
 A. Pants or shorts of sweat, spandex, or blue jean material.
 B. Tank tops, undershirts, halter tops, tube tops, bare midriffs, transparent clothing, hooded shirts or plunging necklines (front or back);
C. Clothes which are torn, ragged or have holes;
D. Skirts, shorts, dresses, jumpers shorter than midthigh;
 E. Outer coats, windbreakers, hats, scarves, earmuffs, bandannas, curlers, goggles, sunglasses;
 F. Beepers, walkman type players, cell phones, laser pens and other types of electronic devices which are not prescribed for instructional purposes;
 G. Footwear which causes noisy distraction or which is unsafe or a health hazard; CT Page 7516
 H. Jewelry or wallet/key chains that can be dangerous. Discipline Policy, Article 5.4 (1998-1999)
In the elementary and middle schools, there is an optional uniform policy that applies. The purpose of this policy is to "maintain order and decorum in the educational environment so as to avoid interference with the educational process." Discipline Policy, Article 5.1 (1998-1999). The uniform policy is as follows:
BOYS:
 5.1.1 Pants, shorts (colors: solid navy blue, gray, or khaki) — must be "dress" or "docker" style pants or knee length shorts — worn or belted at the waist.
 5.1.2 Tops (colors: solid white or light blue) — must be oxford, polo, or turtleneck style with sleeves (short or long) and collar. Must be tucked into the pants/shorts at all times. Individual schools may choose a third color from the following: solid yellow, pink, navy blue or black. Please contact individual school for their choice.
 5.1.3 Optional — sweater (v-neck or cardigan), blazer, suit jacket or vest — worn over top (color: solid navy blue, white, gray or same color as top)
GIRLS:
 5.1.4 Jumpers, skirts, pants, shorts, skorts (colors: solid navy blue, gray or khaki) — must be "dress" or "docker" style pants or knee length shorts. Pants, shorts, skirts and skorts must be worn or belted at waist.
 5.1.5 Tops (colors: solid white or light blue) — must be oxford, polo, or turtleneck style with sleeves (short or long) and collar. Must cover waistline when arms are raised. Individual schools may choose a third color from the following: solid yellow, pink, navy blue or black. Please contact individual school for their choice.
 5.1.6 Optional — sweater (v-neck or cardigan), blazer, suit jacket or vest — worn over top (color: solid navy blue, white, gray or same color as top) CT Page 7517
 5.1.7 SHOES (Boys and Girls) 1. Sneakers are not considered shoes. Sneakers are only to be worn in gym class, except as stated below under Gym Day Attire. 2. Sandals are not permitted.
Discipline Policy, Article 5.1 (1998-1999)
The policy allows exceptions to the mandatory dress code and the uniform policy to accommodate for religious beliefs, health conditions and financial need. See Minutes from Waterbury Board of Education Special Meeting on May 10, 1999.
Those parents who do not wish their children to wear the uniform may "opt-out" of the uniform policy by signing an ottout waiver form and returning it in person to the school administration. The policy provides that parents may opt-out for a set period of time consisting of the two weeks before and the two weeks after the commencement of the school year. Discipline Policy, Article 5.2 (1998-1999). By opting out of the uniform policy, the students are subject only to the mandatory dress code in Article 5.4 of the Discipline Policy.
During the pilot program, the uniform policy was not enforced. However, the discipline for all other dress code violations was suspension for the second and all following offenses. On September 21, 1998, the Board changed the disciplinary procedures for dress code violations as follows:
From:
 #18 Dress Code Violation as per Board Rules High Schools: First Offense: Notify parents students to change clothes. Be isolated at school or return home for proper clothing and return to class. Second Offense: Suspension (minimum 1 day) Middle Schools: Same. Elementary Schools: Same.
To:
 #18 Dress Code Violation as per Board Rules High Schools: First Offense: Verbal Warning. Second Offense: Notify Parent/Guardian. Third Offense: Inhouse Suspension. CT Page 7518 Middle Schools: First Offense: Verbal Warning. Second Offense: Notify Parent/Guardian. Third Offense: In-house Suspension, recess or lunch suspension as determined by Principal. Elementary Schools: First Offense: Verbal Warning. Second Offense: Notify Parent/Guardian. Third Offense: In-house Suspension, recess or lunch suspension as determined by Principal.
Minutes of Waterbury Board of Education Special Meeting on September 21, 1998, p. 758.
The disciplinary procedures were changed again on February 17, 1999 to:
#18 School Attire Violation as per Board Rules
 High School — First Offense: Removal from class with opportunity to correct and return to class. If not corrected, immediate in-school suspension and notification of parent. Second Offense: In-school suspension and after-school detention. Third and All Subsequent Offenses: Out of school suspension, one day.
 Middle School — First Offense: Removal from class with opportunity to correct and return to class. If not corrected, immediate in-school suspension and notification of parent. Second Offense: In-school suspension and after-school detention. Third and All Subsequent Offenses: Out of school suspension, one day.
Minutes of Waterbury Board of Education Special Meeting on February 17, 1999, p. 153-54.
 II. STANDARD OF REVIEW
In order for a temporary injunction to be issued, the court must determine that: "(1) the plaintiff [has] no adequate legal remedy; (2) the plaintiff would suffer irreparable injury absent a [temporary injunction]; (3) the plaintiff [is] likely to prevail on [the merits]; and (4) the balance of the equities [favor] a [temporary injunction]." Waterbury Teachers Assn. v.Freedom of Information Commission, 230 Conn. 441, 446, CT Page 7519645 A.2d 978 (1994) The deprivation of constitutional rights constitutes irreparable injury. Elrod v. Burns, 427 U.S. 347, 373,96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); 11A Wright, Miller Kane, Federal Practice and Procedure § 2948.1 at 161 (2d ed. 1995)
 III. DISCUSSION
The plaintiffs argue that their constitutional rights to liberty and privacy are being violated by the Waterbury school attire policy because they are not able to wear the clothes to school they choose and they are being suspended for wearing clothing that is not in compliance. The plaintiffs primarily rely on Bannister v. Paradis, 316 F. Sup. 185 (D.N.H. 1970), Crossenv. Fatsi, 309 F. Sup. 114 (D.Conn. 1970) and Yoo v. Moynihan,28 Conn. Sup. 375, 262 A.2d 814 (1969). Specifically, the plaintiffs argue that (1) General Statutes § 10-221f should be read to mean that school boards can only specify a uniform for voluntary use, not mandatory; (2) the ability to opt-out of the uniform policy should be extended to the entire school year, not just a one month time period at the beginning of the school year; (3) the defendants should have made a decision as to whether the clothing the plaintiffs were wearing at the time of the suspension created a health or safety hazard or were distracting to the classroom environment; and (4) that the policy of suspending students for violation of the school attire policy forces the students to forego their constitutional right to free public education in order to enjoy their constitutional rights to privacy and liberty.
The defendants argue that the school attire policy is rationally related to its legitimate educational interests in reducing distractions, creating a safe environment, reducing clothing costs, promoting a sense of community among students, preparing students for the work environment and enhancing the public perception of the school system. They contend that the plaintiffs are challenging the constitutionality of General Statutes § 10-221f and have not proven beyond a reasonable doubt that the statute is unconstitutional.
A. Interpretation of General Statutes § 10-221f
The defendants argue that the plaintiff has challenged the constitutionality of General Statutes § 10-221f, which grants authority to local school boards to "specify" a school uniform. The defendants contend that the term "specify" authorizes the CT Page 7520 school boards to make uniforms mandatory. They argue, therefore, that the plaintiffs must prove beyond a reasonable doubt that the statute is unconstitutional. They claim that the plaintiffs have failed to do so.
The plaintiffs argue that the use of the word "specify" in the statute indicates that the legislation only granted school boards authority to recommend a school uniform for students to wear on a voluntary basis. They argue that such an interpretation of the statute avoids the question of its constitutionality.
"In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language. . . ." Connecticut General Statutes § 1-1 (a) See also,Doe v. Manson, 183 Conn. 183, 186, 438 A.2d 859 (1981) ("Where a statute does not define a term, it is appropriate to look to the common understanding expressed in the law and in dictionaries.") In Webster's Tenth New Collegiate Dictionary, the word "specify" is defined as "to name or state explicitly or in detail." Id. at 1129. Black's Law Dictionary defines "specify" as "[t]o mention specifically; to state in full and explicit terms; to point out; to tell or state precisely or in detail; to particularize, or to distinguish by words one thing from another." Id. at 1399. The word "uniform" is defined in Webster's as "dress of a distinctive design or fashion worn by members of a particular group and serving as a means of identification"; Id. at 1292; and in Black's as "[c]onforming to one rule, mode, pattern, or unvarying standard; not different at different times or places. . . . applying alike to all within a class; sameness," Id. at 1530. Although the parties agree to these basic definitions, they disagree as to the meaning that should be derived from them. The plaintiffs argue that the term "specify" is descriptive rather than commanding, advancing their interpretation that the statute only authorizes school boards to "describe" a uniform for voluntary use by the students in their jurisdiction. The defendants contend that the statute authorizes school boards to mandate school uniforms.
"Ordinarily, when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." Connecticut Light Power Co. v. Texas-Ohio Power, Inc.,243 Conn. 635, 656, 708 A.2d 202 (1998). "A statute does not become ambiguous solely because the parties disagree as to its meaning." Nichols v. Warren, 209 Conn. 191, 198 n. 5, 550 A.2d 309
CT Page 7521 (1988); State v. Ingram, 43 Conn. App. 801, 819, 687 A.2d 1279
(19960, cert. denied, 240 Conn. 908, 689 A.2d 472 (1997). "In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result." (Internal quotation marks omitted.) WillowSprings Condominium Assn., Inc. v. Seventh ERT Development Corr.,245 Conn. 1, 26, 717 A.2d 77 (1988). "[C]ompelling principles of statutory construction . . . require [the court] to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. [The court] must avoid a construction that fails to attain a sensible result that bears directly on the purpose the legislature sought to achieve." (Internal quotation marks omitted.) Office of Consumer Counsel v. Dept. of PublicUtility Control, 246 Conn. 18, 42, 716 A.2d 78 (1998)
"The factors that [the court] looks to in construing a statute include its legislative history, its language, the purpose it is to serve, and the circumstances surrounding its enactment." (Internal quotation marks omitted.) West Haven v.Hartford Insurance Co., 221 Conn. 149, 158, 602 A.2d 988 (1992). The court also looks to "the legislative policy [the statute] was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) Luce v.United Technologies Corp. , 247 Conn. 126, 133, 717 A.2d 747
(1998)
Although the parties' disagreement as to the interpretation of the statute does not make it ambiguous, the court finds that the statute on its face does not clearly express whether the legislature intended the statute to authorize only voluntary uniform policies or whether the statute also authorizes mandatory uniform policies. It is therefore necessary to examine the legislative history of the statute and the circumstances surrounding its enactment.
As discussed previously, the language of the original House Bill 5417 included the phrase "on a voluntary basis." This language was deleted from the bill by the Committee on Education after the Committee's review of the research memorandum from the Office of Legislative Research, which discussed similar statutes in other states. The substitute House Bill 5417 passed the House of Representatives and the Senate without further debate. When submitting the bill to the Senate the proponent, Senator Judith Freedman, one of the co-chairs of the Education Committee, CT Page 7522 remarked, "This bill is a permissive bill for local boards of education. If they so desire, they may require (emphasis added) the students in their public schools to wear uniforms." 39 Senate Proc., Pt. 8, 1996 Sess., p. 2505.
In addition, the fiscal analysis that accompanied the substitute bill indicated that the bill had no fiscal impact because" [l]ocal and regional school districts could, under current statute, already require school uniforms." Fiscal Note/Bill Analysis, Substitute House Bill No. 5417 dated April 9, 1996. The current statutes referred to are General Statutes §§10-220 and 10-221, which delegate the state's responsibility to provide and administer public education to local and regional boards of education. A few cities in Connecticut tried school uniform policies under these statutes. For example, in 1990, both the Bridgeport and New Haven boards of education experimented with school uniform policies under the general authority afforded by §§ 10-220 and 10-221. See M. Sue Stanley, School Uniforms andSafety, 28 Education Urban Soc'y 424, 425 (1996)
The court is equally persuaded by the rejection by the legislature of the language, "on a voluntary basis," that existed in the original bill, the remarks of Senator Freedman and by the surrounding circumstances of the enactment of the statute that the legislature intended to authorize school boards to establish either a mandatory or voluntary uniform policy in their schools at their discretion. The court refuses to interpret the statute to have only one meaning, which the legislature expressly rejected. See Glastonbury Co. v. Gillies, 209 Conn. 175, 184,550 A.2d 8 (1988) ("The rejection by the Legislature of a specific provision contained in an act as originally introduced is most persuasive to the conclusion that the act should not be construed to include the omitted provis ion.")
The plaintiffs have the burden of showing that they would prevail at a trial on the merits. Because the court finds that the statute authorizes local school boards to mandate school uniforms, the plaintiffs bear the burden of proving, beyond a reasonable doubt, that the statute is unconstitutional as applied by the Waterbury Board of Education. State v. Merdinger,37 Conn. App. 379, 655 A.2d 1167, cert. denied, 233 Conn. 914,659 A.2d 187 (1995). The plaintiffs have not argued the constitutionality of the statute. The court, therefore, finds that § 10-221f is constitutional. The court, however, must still address whether the Waterbury school attire policy itself deprives the plaintiffs CT Page 7523 of their constitutional rights.
B. Constitutionality of Waterbury School Attire Policy
The plaintiffs argue that both the uniform policy and the ban on jeans deprive them of their constitutional rights to privacy and liberty in that they cannot wear the clothes to school that they choose to wear. They argue that the school attire policy is irrational and arbitrary because the defendants conducted no empirical studies to support their findings that uniforms would reduce theft and fighting or the frequency with which blue jeans caused problems in the schools.
The defendants argue that they followed a thoughtful and deliberative process in adopting the school attire policy and they presented cogent evidence that the policy serves several important educational interests.
"Courts generally refrain from interfering with the administration of public schools. See Epperson v. Arkansas,393 U.S. 97, 104 [89 S.Ct. 266, 21 L.Ed.2d 228] (1968) (`Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.')."Isaacs v. Board of Education, 1999 WL 179023 (D.Md. 1999)
In analyzing challenges to the constitutionality of state action for deprivations of liberty and privacy, the court's first inquiry is whether the right alleged to be violated is a fundamental right. See Florestal v. Government EmployeesInsurance Co., 236 Conn. 299, 314, 673 A.2d 474 (1996). The plaintiffs have not argued that the rights allegedly violated are fundamental rights and have conceded that the defendants may regulate student attire when the regulation advances an educational interest such as health, safety or avoidance of distractions or disruptions. Therefore, the regulations here "need only be rationally related to some legitimate government purpose in order to withstand . . . challenge. . . ." Florestalv. Government Employees Insurance Co., supra, 236 Conn. 314-15. "Under the rational basis test, [t]he court's function . . . is to decide whether the purpose of the legislation is a legitimate one and whether the particular enactment is designed to accomplish that stated purpose in a fair and reasonable way." Id. See also, Caldor's Inc. v. Beddina Barn, Inc., 177 Conn. 304,314-15, 417 A.2d 343 (1979) ("The constitutional issue is whether CT Page 7524 legislative classifications or discriminations bear `a rational relationship to a legitimate state end and [are] based on reasons related to the pursuit of that goal.'"); Isaacs v. Board ofEducation, supra.
It is acknowledged by both parties that "students have a constitutional right to govern their personal appearance, with respect to their clothing or apparel. . ." Wallace v. Ford,346 F. Sup. 156, 161 (E.D.Ark. 1972). This right, however, is "subject to the right of the school authorities to establish those regulations which are necessary in order to carry out the educational mission of the school." Id. at 162. "It is clear that carefully drawn dress regulations which have the effect of promoting legitimate objectives, such as safety, health, decency and, indeed, classroom decorum, are permissible. See Bannister v.Paradis, 316 F. Sup. 185 (D.N.H. 1970)." Id. at 162 n. 4. "Personal freedoms are not absolute. . . ." Isaacs v. Board ofEducation, supra.
In addition, minors do not have the same constitutional rights as adults. A plurality of the United States' Supreme Court has recognized that the constitutional rights of children do not equal those of adults. Belotti v. Baird, 443 U.S. 622, 634,99 S.Ct. 3035, 3043, 61 L.Ed.2d 797 (1979). In Belotti, the court gave three reasons for its conclusion: "the peculiar vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child-rearing." Id. "Consequently, the state has more control over the conduct of minors than it does over adults. Ginsbera v. New York, 390 U.S. 629, 638, 88 S.Ct. 1272,1280, 20 L.Ed.2d 195 (1967) (quoting Prince v. Massachusetts,321 U.S. 158, 170, 64 S.Ct. 438, 444, 88 L.Ed. 645 (1944))." Barberv. Colorado Independent School District, 901 S.W.2d 447 (Tex. 1995)
The reasons for the institution of the Waterbury uniform policy were stated in the Uniform Committee Report presented to and adopted by the Waterbury Board of Education. See Defendants Exh. D. The enumerated reasons are as follow:
 A. To maintain order and decorum in the educational environment so as to avoid interference with the educational process.
B. To avoid disruptions of classroom atmosphere and CT Page 7525 decorum.
C. To maintain and promote discipline in the school.
D. To avoid distraction of other pupils.
E. To prevent disturbances among students.
F. To contribute to the administration of the classroom.
G. To promote safety in the schools.
In addition the report incorporates the seven characteristics of effective schools identified by the Connecticut State Department of Education, which are:
1. A safe and orderly environment.
2. A clear school mission.
3. Instructional leadership.
4. High expectation for student performance.
5. Student time on task.
6. Frequent monitoring of students' progress.
7. Home to school relations.
The defendants presented testimonial and documentary evidence that support these objectives. Several witnesses testified that they had observed a difference in the manner in which the students comport themselves on school grounds. They also testified that teasing and disputes among students related to clothing issues and theft of clothing at school has decreased. Also, their testimony indicated that the students feel better about themselves and their school because they are not as concerned with having to have clothing in the latest style or the most expensive and they feel that they are the same as everyone else. Several administrators testified that they believed that the school attire policy creates a safer school environment.
The court finds that the school attire policy promotes a more effective learning climate by eliminating clothing distractions. CT Page 7526 There were numerous witnesses that testified to the fact that certain clothing — including blue jeans that are worn baggy and hanging on the buttocks revealing the wearer's underwear, expensive blue jeans, sneakers, jackets, etc. — created disruptions and distractions in the classroom. The school attire policy also increases safety in the schools by eliminating clothing that can be pulled on or tripped over or can cause fights and by permitting immediate identification of trespassers on school grounds. In addition, the school attire policy also improves students' school spirit and pride, places poor and rich students on an even footing regarding appearances, and assures appropriate dress in school. All of these are legitimate interests of the school board, and the school attire policy is rationally based to meet them. The evidence reveals that these interests are, in fact, being met by the school attire policy.
The plaintiffs specifically argue against the ban on blue jeans. They claim that it is arbitrary for the Board to ban blue jeans but not any other color of jeans and that not all styles of blue jeans are the baggy type that is causing the problems in the schools. There was, however, testimony from school administrators who had been in the education field for numerous years that the ban on blue jeans was rational based on their observation that the baggy jeans the children were wearing generally were made of blue jean material and that these blue jeans had big pockets in which students could hide weapons or contraband. It was their opinion that these jeans created a significant safety hazard. "If . . . school boards elect to have regulations concerning dress and those regulations have a valid relationship to the educational mission of the school, a certain degree of arbitrariness should be tolerated to permit the effective and speedy enforcement thereof." Wallace v. Ford, supra, 346 F. Sup. 163
. The court declines to replace the judgment of experienced education professionals with its own judgment. The ban on blue jeans is rationally based on the legitimate interest of keeping the schools in Waterbury safe.
Because the uniform policy and the mandatory attire code banning blue jeans is rationally related to a number of legitimate educational interests, the court finds that the school attire policy, in so far as it limits the clothing that students may wear to school, does not deprive the plaintiffs of their constitutional rights to privacy and liberty.
The plaintiffs also argue that the opt-out period is too CT Page 7527 limited, that there is no rational reason that the opt-out period could not be extended to the entire school year. The defendants argue that the administrative burden would be excessive should they have to handle additional opt-out students throughout the whole year rather than just at the beginning of the year. Barbara Giancarlo, the house principal for the sixth grade at West Side Middle School, testified that at the beginning of the year a list is prepared of all the opt-out students which is distributed to all the faculty and staff and that meetings are held to discuss the handling of these student. She testified that should they have to continually accept optout students they would have to keep informing the faculty and staff (at least fifteen faculty members per child) each time and this could lead to confusion and children being incorrectly punished. She believed an all-year opt-out plan would create a great administrative burden on her office and teachers in implementing the school attire policy. Other administrators testified also that there would be an additional burden on their offices if they had to continually accept and process opt-out forms year round. The plaintiffs argue that the defendants' witnesses are only speculating as to whether the administration of the school would be unduly burdened. There was, however, administrators' testimony that clearly demonstrates that their concerns are well-founded and based on prior experience. The court finds their testimony to be credible. SeeIsaacs v. Board of Education, supra; King v. Saddleback JuniorCollege Dist., 445 F.2d 932 (9th Cir.), cert. denied,404 U.S. 979, 92 S.Ct. 342, 30 L.Ed.2d 294 (1971) ("A court might disagree with [the school authorities' professional judgment, but it should not take over the operation of their schools."). It is the court's opinion that the defendants have provided sufficient evidence to support their claim that extension of the opt-out period to the entire school year would be administratively burdensome.
The plaintiffs also argue that the suspensions that they received under the new disciplinary procedures for violations of the school attire policy established in February 1999 violate their constitutional rights because such discipline makes them choose between their right to a free public education and their constitutional privacy and liberty rights. The new disciplinary procedures for violations of the attire policy changed the punishment from no out of school suspensions to out of school suspensions for the third and all following violations of the dress code. These new disciplinary procedures apply to the high schools and middle schools, but not the elementary schools. CT Page 7528
"There can be no doubt about the state's legitimate and substantial interest in maintaining order and discipline in the public schools." Baker v. Owen, 395 F. Sup. 294, 300, (M.D.N.C.) aff'd, 423 U.S. 907, 96 S.Ct. 210, 46 L.Ed.2d 210 (1975). "It should be clear beyond peradventure, indeed self-evident, that to fulfill its assumed duty of providing an education to all who want it a state must maintain order within its schools, as the Supreme Court has recognized on several occasions. See, e.g.,Goss v. Lopez [419 U.S. 565, 95 S.Ct. 729 (1975)]; Tinker v. DesMoines School Dist., 393 U.S. 503, 507, 89 S.Ct. 733,21 L.Ed.2d 731 (1969)." Id., 301. "The need to maintain appropriate discipline in schools must favor more administrative discretion than might be permitted in other parts of our society." Bivens v.Albuquerque Public Schools, 899 F. Sup. 556, 563 (D.N.M. 1995)
In the present case, the school administrators believed they needed additional ability to enforce the school attire policy in order to maintain compliance. At the hearing, those administrators testified that compliance was very high at the beginning of the school year but started dropping shortly thereafter. They believed that to maintain compliance, compulsion would be necessary. It is reasonable to expect that to maintain the focus of the school attire policy and to continue promoting its educational interests that some sort of enforcement measures would be required.[3] The decision of what enforcement measures are necessary should be made by the school administrators.
One of the plaintiffs' arguments that the ban on blue jeans, the limited period to opt-out of the uniform policy and the disciplinary procedures for violation of the school attire policy are arbitrary rests on the fact that the Board conducted no empirical study to determine, for example, the number of instances in which discipline was necessary to rectify misbehavior of a student caused by the wearing of blue jeans or expensive designer clothing. The court declines to require the defendants to provide rigorous, scientific proof of its findings concerning the safety issues of blue jeans or the benefits derived from uniforms. Given the multiplicity of the factors that may affect schools every day, the court declines to overrule the Board's judgment that the school attire policy can help achieve the Board's goals simply because uncertainty exists in regard to the school attire policy's effectiveness.
In addition, the plaintiffs argue that, in suspending them, CT Page 7529 the defendants did not make a determination that the clothing they were wearing at that time created a health or safety hazard or was distracting or disrupting the classroom. In Isaacs v.Board of Education, supra, the court upheld the school's ban on hats in the classroom against a constitutional challenge by a student who wished to wear a headwrap. The court found that ample evidence had been admitted that the administrators were concerned about problems that could arise by students wearing hats, including blocking other students' view of the blackboard, blocking the teacher's view of students seated behind the student wearing the hat, pulling off hats and using them as toys, or using hats as a place to hide contraband or cheat sheets. The court held that the "[fact] that none of these problems arose in the few hours that [the plaintiff] wore her headwrap in school, and have never arisen with any other headwrap, are not dispositive. . . . [T]he relative likelihood of disruption is great enough to justify the school system's decision to bar hats from the classroom. Furthermore, it would be entirely unrealistic to ask school administrators (along with the multitude of educational decisions that they must make daily) to decide on a hat-by-hat basis whether a particular hat poses sufficient danger of disruption. [The plaintiff's] argument that they be required to do so underscores the unreasonableness of her position." Id. Similarly, in the present case, it is unreasonable to expect the school administrators to make a day-by-day, student-by-student determination that what is being worn is either a health or safety hazard or is disruptive or distracting. Although the school's concerns about blue jeans and non-compliance with the uniform policy represent "potential problems" rather than documented ones, their concerns are well-founded and based on their prior experience as educators. Again, the court finds the plaintiffs failed to meet their burden of proof.
Finally, the adult plaintiffs argue that the uniform policy violates their constitutional right to a free education for their children because it requires them to buy separate clothes for school. The overwhelming evidence at the hearing was that the cost of the uniforms was substantially lower and parents paid less for the uniforms than they do for regular school clothing. There was testimony that various price comparisons were made by board members, teachers and administrators and parents. One witness testified that a uniform wardrobe of three pants and three shirts was approximately $100 (for adult sizes) In comparison, one of the parents of the minor plaintiffs testified that she spent over $600 on clothing for her child for the school CT Page 7530 year. There was also testimony that, since the children are not wearing their school clothes for play, these clothes last longer and can be passed on or handed down to other children in the family. The court finds, therefore, that the parent plaintiffs' rights to a free education for their children has not been violated. In fact, the parents' costs of educating their children have been decreased.[4]
During the hearing the plaintiff asked each witness if they agreed with this statement from the school attire policy: "Each parent/guardian is responsible for his/her child's dress." Each witness agreed with this statement; however, most of them indicated that the statement needed to be read in the context of the Board's discipline policy. The court agrees that this statement must be read with the entire discipline policy, not on its own. It appears that the plaintiffs would have this statement read to mean that the parent only has the responsibility for his/her child's dress and that the school board has no ability to specify how a child as a student should dress. The court disagrees. The court reads this statement to mean that the parent is responsible for making sure that his/her child is appropriately dressed for school and the parent is responsible when his/her child is not appropriately dressed. The plaintiffs have conceded that the defendants can regulate the students' attire when such regulations are for the health and safety of the students or are to eliminate distractions and disruptions in the classroom. By that concession, the plaintiffs have also conceded that a child's parents are not the only parties that may decide what is proper school attire. Since students are generally minors and parents are generally responsible for their minor children, it follows that parents are responsible for their children's dress when attending school, as well as making sure their children follow all other disciplinary rules.
The court also notes that none of the plaintiffs have claimed that they have not been accommodated for any religious belief, health issue or financial burden. The plaintiffs also have not argued that they have been denied right to freedom of expression protected by the first amendment of the United States constitution. "Public school students enjoy a degree of freedom of speech within the schoolhouse gates that is balanced against the added concern of the need to foster an educational atmosphere free from undue disruptions to appropriate discipline. See Tinkerv. Des Moines Indep. Community School Dist., 393 U.S. 503, 509,89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969) (suspension of students CT Page 7531 who wore black arm bands to school to protest Vietnam war unconstitutionally restricted students' freedom of expression absent showing that conduct would materially and substantially interfere with requirements of appropriate discipline in operation of school or impinge on rights of other students. . . . Not all conduct, however, can be labeled speech. United States v.O'Brien, 391 U.S. 367, 376, 88 S.Ct. 1673, 1678, 20 L.Ed.2d 672
(1968). The wearing of a particular type or style of clothing usually is not seen as expressive conduct. Tinker,393 U.S. at 507-08, 89 S.Ct. At 736-37 ("The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style or deportment."; Freeman v.Flake, 448 F.2d 258, 260-61 (10th Cir. 2.971) (school regulation of students' hair length does not violate First Amendment; wearing of long hair not akin to pure speech), cert. denied,405 U.S. 1032, 92 S.Ct. 2.292, 31 L.Ed.2d 489 (1972); New Rider v.Board of Education, 480 F.2d 693 (10th Cir.), cert. denied,414 U.S. 2.097, 94 S.Ct. 733, 38 L.Ed.2d 556 (1973) and Hatch v.Goerke, 502 F.2d 2.189 (10th Cir. (1974) (same, even where students are American Indians wearing long braided hair as symbol of religion and culture); Olesen v. Board of Education,676 F. Sup. 829, 822 (N.D.Ill. 1987) (First Amendment does not protect student's wearing of earring to express his individuality in violation of school dress code)." Bivens v. AlburquerquePublic Schools, supra, 899 F. Sup. 539-60. In Bivens, the court held that the wearing of sagging pants is not speech or expressive conduct protected by the first amendment. Id. Likewise, in the present case, the clothing the minor plaintiffs wore did not constitute speech, nor was it expressive conduct protected by the first amendment.
The plaintiffs and the defendants have cited to many federal and state decisions that decide whether grooming codes that regulate hair length violate students' constitutional rights to freedom of expression, privacy and liberty. Most of the case law on this subject dates from the late 1960s and early 1970s. The courts were greatly split as to whether these types of regulation are constitutional. The United States Supreme Court has refused to address this issue. Although this court acknowledges these cases, it finds that grooming codes are inherently more intrusive than dress codes because they go beyond the school doors. Although a student can change his clothing when he leaves school, he cannot change his hairstyle as easily.
The plaintiffs primarily rely on Bannister v. Paradis, 316 CT Page 7532 F. Sup. 2. 85 (D.N.H. 1970), Crossen v. Fatsi, 309 F. Sup. 2.14 (D.Conn. 1970), and Yoo v. Moynihan, 28 Conn. Sup. 376,262 A.2d 814 (1969) The court finds these cases neither controlling nor persuasive. In Bannister v. Paradis, the court upheld the constitutional challenge to the school district's ban on dungarees because it found the rule to be arbitrary because no showing was made that the wearing of dungarees inhibited or tended to inhibit the educational process. In the present case, there was testimony from several witnesses that blue jeans were a distraction to the students and a safety hazard. In Crossen v.Fatsi, the dress code was stricken as being constitutionally vague. The plaintiffs in this case have made no claim that the school attire policy is unconstitutional because it is vague. Finally, Yoo v. Moynihan dealt with a grooming code, which this court agrees is inherently more intrusive than a dress code.
 IV. CONCLUSION
"Citizens expect and demand that their children be physically safe in the schools to whose supervision they are consigned, and the citizenry is outraged if the schools are less than safe and orderly. At the same time we expect that the requirements of order and of protection and implementation of the educational program of the school, will be met by limited enforcement means — the force of the school establishment itself and the school-related disciplines of reprimand, suspension, and expulsion. . . . A school may not stifle dissent because the subject matter is out of favor. Free expression is itself a vital part of the educational process. But in measuring the appropriateness and reasonableness of school regulations against the constitutional protections of the First andFourteenth Amendments the courts must give full credence to the role and purposes of the schools and of the tools with which it is expected that they deal with their problems, and careful recognition to the differences between what are reasonable restraints in the classroom and what are reasonable restraints on the street corner." Ferrel v. Dallas Independent School District,392 F.2d 697, 704 (5TH Cir.) (Godbold, Circuit Judge, specially concurring), cert. denied, 393 U.S. 856, 89 S.Ct. 98, 21 L.Ed.2d 2.25 (1968)
The court finds that the Waterbury school attire policy is rationally related to the Waterbury Board of Education's legitimate interests in protecting the health and safety of the students in its schools and eliminating distractions or CT Page 7533 disruptions in the classrooms. Having found that the plaintiffs' constitutional rights have not been violated by the Waterbury school attire policy, the court finds that the plaintiffs have not met their burden of proving that a temporary injunction should be issued. The court's finding that the school attire policy is constitutional precludes a finding that the plaintiffs will prevail at a trial on the merits. The plaintiffs, therefore, have failed to meet the standards for the granting of a temporary injunction and their application for a temporary injunction is denied. Caruso, J.